**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | |
|---|---|
| UNITED STATES EX RELS. [UNDER SEAL], | Case No.: _____ |
|        Plaintiffs-Relators, | **DEMAND FOR JURY TRIAL** |
| vs. | |
| [UNDER SEAL], | **FILED UNDER SEAL**<br>**(False Claims Act, 31 U.S.C. § 3730)** |
|        Defendants. | |

**[UNDER SEAL]**
**COMPLAINT PURSUANT TO THE FALSE CLAIMS ACT, 31 U.S.C. §§ 3729, _et seq._**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | | |
|---|---|---|
| UNITED STATES *ex rels.* | ) | |
| SUJATHA GOLI, MD, SAMBASIVA | ) | |
| SUKHAVASI, MD, and | ) | |
| PATRICIA COPLEY, MD, | ) | |
| | ) | **Case No. _____** |
| Plaintiffs/Relators, | ) | |
| | ) | |
| v. | ) | **DEMAND FOR JURY TRIAL** |
| | ) | **FILED UNDER SEAL** |
| STEWARD HEALTH CARE SYSTEM, | ) | **PURSUANT TO 31 U.S.C. § 3730** |
| LLC, THE MEDICAL CENTER OF | ) | **DO NOT PLACE IN PACER** |
| SOUTHEAST TEXAS, ROOZBEH | ) | |
| SHARIF, MD, | ) | |
| | ) | |
| Defendants. | ) | |

**REALTORS' FALSE CLAIMS ACT COMPLAINT**

Sujatha Goli, MD ("Dr. Goli"), Sambasiva Sukhavasi, MD ("Dr. Sukhavasi"), and Patricia

Copley, MD ("Dr. Copley") (collectively "Relators"), by and through their counsel, bring this

action against Steward Health Care System, LLC ("Steward"), The Medical Center of Southeast

Texas ("MCST"), and Roozbeh Sharif, MD ("Defendant Sharif") (collectively, "Defendants"),

pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA").

As then Acting Associate Attorney General Stuart F. Delery stated, "[o]ur seniors rely on

the Medicare and Medicaid programs to provide them with quality care, ensuring that they are

treated with dignity and respect when they are most vulnerable".[1]

## I. PRELIMINARY STATEMENT

---

[1] U.S. Department of Justice, *Extendicare Health Services Inc. Agrees to Pay $38 Million to Settle False Claims Act Allegations Relating to the Provision of Substandard Nursing Care and Medically Unnecessary Rehabilitation Therapy* (Oct. 10, 2014), https://www.justice.gov/opa/pr/extendicare-health-services-inc-agrees-pay-38-million-settle-false-claims-act-allegations.

2

1. This case has four issues involving the Defendants, who are co-conspirators, unlawful, knowing and intentional schemes conducted between at least August 2020, through the present (the "Relevant Period"), which led to the submission of false and fraudulent claims to Medicare, Medicaid, and other government programs (hereinafter "Government Programs") in violation of the False Claims Act by engaging in the conduct set forth below. The Defendants' conduct allegedly constitutes violations of the FCA, which the U.S. Department of Justice has deemed to be material to its paying for claims. If left unchecked, Defendants will continue to submit false and fraudulent claims for reimbursement for services not provided, for up coded services, and for substandard or worthless care, further causing the already-strained Medicare and Medicaid systems to overpay millions of dollars to Steward, MCST, and Dr. Sharif, as well as continuing to adversely impact patient care, all in violation of the False Claims Act.

2. **First,** Defendant Steward, as the parent company and owner of Defendant MCST, had ownership and control of the hospital and was directly involved in the matters raised herein. The Defendants' knowing and intentional billing of Government Programs, through Defendant Sharif's utilization, for example, of CPT code 99291 (evaluation and management of the critically ill or critically injured patient, first 30-74 minutes) when the intensivists, including Relators, were assigned to the particular patient and already provided the same services that Defendant Sharif allegedly provided, as well as Dr. Sharif's copy and pasting of medical record notes when no critical services were provided, amount to the Defendants' co-conspiracy submission of false and fraudulent claims for services.

3. **Second,** the Defendants' have been engaging in a fraudulent scheme whereby Defendant Sharif creates medical records for utilization as the basis for payment from Government Programs for higher and more expensive levels of medical care than were actually performed – a practice

3

routinely referred to as "upcoding." Defendant MCST and Defendant Sharif's submission of claims for services that were not substantiated by medical necessity or medically indicated and resulted in upcoding by falsifying or causing to be falsified clinical information within patient files as herein substantiated with specific patient examples.

**3. Third,** Defendant Steward and Defendant MCST also knew that Defendant Sharif was providing substandard care to patients to lower costs and increase revenues, which included withholding appropriate antibiotics to remediate a urinary track infection and denying patients being transferred to the intensive care unit ("ICU"), which led to at least one patient death. The withholding of care is the opposite of upcoding but the impact on all three of the Defendants' monetary gain is the same – it increases while patients and the Government Programs, as well as the taxpayers, pay the price.

**4. Finally,** all the Defendants co-conspired to knowingly retaining the overpayments, which constitutes both a reverse false claims and violation of the respective 60-day Rule, 81 Fed. Reg. 7653 (Mar. 14, 2016), referring to Section 6402(a) of the Affordable Care Act, Pub. L. 111-148 (Mar. 23, 2010).

## II. JURISDICTION AND VENUE

5. This Court has jurisdiction over the claims brought under the FCA pursuant to 31 U.S.C. § 3730(a), and 28 U.S.C. §§ 1331 and 1345, and over the common law claims pursuant 28 U.S.C. § 1345.

6. This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which provides for nationwide service of process, and 28 U.S.C. § 1391(b), because Defendants transact business in this Eastern District of Texas ("District") and a substantial part of the events giving rise to this Complaint occurred within the District.

7. Defendants, whose principal places of business are within the District, submitted allegedly false and fraudulent claims to Government Programs for reimbursement for services not provided, for up coded services, and for substandard or worthless care.

8. Relators are an "original source" and are otherwise authorized to maintain this action in the name of the United States as contemplated by the FCA.

9. None of the allegations set forth in this Complaint are based upon any public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or General Accounting Office report, hearing, audit, or investigation, or from the news media of which Relators were not the original source of the information. Relators complied with the statutory requirements of 31 U.S.C. § 3730(b)(2) by serving on the United States a copy of this Complaint and a written Disclosure Statement of substantially all material evidence and information that Relators possess.

10. As required, this Complaint has been filed *in camera* and under seal and shall not be served on Defendants until the Court so orders.

## III. PARTIES

*Relators*

**11. Sujatha Goli, MD, FCCP ("Dr. Goli")**, is a resident of the State of Texas and is a board-certified physician who practices pulmonary, critical care, sleep, and internal medicine at the Heart and Lung Center of Southeast, Texas, PA. Upon graduating medical school, Dr. Goli completed an internal medicine residency and a combined pulmonary-critical care fellowship at James H. Quillen College of Medicine East Tennessee State University (Johnson City, Tennessee). She is licensed in Texas and is published on a wide range of topics.

5

12. Dr. Goli is a member of the medical staff at The Medical Center of Southeast Texas, a joint physician-owned hospital, which is part of Steward Health Care's private, for-profit health care network. Dr. Goli's first in-person encounter with Defendant Sharif occurred in August 2021, when she was working in the intensive care unit ("ICU"). Since that time, Dr. Goli regularly observed the following pattern and practice by Defendant Sharif at The Medical Center of Southeast Texas: not entering daily progress notes on the day of service but significantly later; copying and pasting of previous progress notes; and upcoding for services not rendered to obtain a higher reimbursement from Medicare, Medicaid, other government programs, and private insurers. Even more disconcerting was the substandard care, which Defendant Sharif rendered and continues to render, as well as the self-referrals through the emergency room at The Medical Center of Southeast Texas.

13. In August 2021 and on January 26, 2022, Dr. Goli along with Dr. Sukhavasi raised concerns on gross deviations in the standards of practice and patient safety, including excess mortality, multiple central lines, and chest tubes, which were similar to those voiced by intensive care unit ("ICU") staff. The January 2022 email exchange occurred between Dr. Gary Mennie, Chief Medical Officer and Josh Snow, President Southeast Texas Medical Center – Beaumont and Southeast Texas Medical Center – Port Artur.

**14. Sambasiva Sukhavasi, MD ("Dr. Sukhavasi"),** is a resident of the State of Texas and is a board-certified physician who practices pulmonary, critical care, and internal medicine in private practice. Upon graduating medical school in India, Dr. Sukhavasi worked as a senior house surgeon in cardiology in India and subsequently completed his residency in internal medicine and two fellowships in the United States – one in pulmonology (Medical College of Ohio) and one in critical care (University of Maryland, Maryland Institute for Emergency Medical Services

(MIEMS)). Dr. Sukhavasi serves or has served as Chief of Staff at Christus St. Elizabeth (Beaumont, Texas) and Chief of Department of Medicine at Christus St. Mary Hospital (Port Arthur, Texas).

15. Dr. Sukhavasi is a member of the medical staff at The Medical Center of Southeast Texas, a joint physician-owned hospital, which is part of Steward Health Care's private, for-profit health care network. Dr. Sukhavasi, as recently as late-June 2022, attempted to obtain a list of medical staff and other members who are owners in the hospital. Neither Defendant Steward nor Defendant The Medical Center of Southeast Texas provided a list of shareholders.

16. Dr. Sukhavasi first learned of Defendant Dr. Roozbeh Sharif in November 2020. At that time, Defendant Sharif was working at The Medical Center of Southeast Texas in the capacity of providing weekend coverage. The hospital administration contracted with Dr. Sharif to provide this coverage. Beginning in August 2021, Dr. Sukhavasi regularly observed the following pattern and practice by Defendant Sharif at The Medical Center of Southeast Texas: Defendant Sharif started seeing patients in the Emergency Room ("ER") even before an ER physician saw the patients. When Dr. Sukhavasi confronted Defendant Sharif about why he was seeing patients in the ER, his response was simply that "he is part of administration." Defendant Sharif continued to see patients in the ER without a referral or request from the attending physician of record.

17. Dr. Sukhavasi also observed the same pattern and practice as Dr. Goli regarding Defendant Sharif's conduct: not entering daily progress notes on the day of service but significantly later; copying and pasting of previous progress notes; and upcoding for services not rendered to obtain a higher reimbursement from Medicare, Medicaid, other government programs, and private insurers. Even more disconcerting was the substandard care, which Defendant Sharif rendered and continues to render, as well as the self-referrals through the emergency room at The

Medical Center of Southeast Texas. Inappropriate conduct that Dr. Sukhavasi observed first-hand included performing procedures without consent and/or without proper indications – specifically placing central lines, hemodialysis catheters, and chest tubes in patients without informed consent when the patient had the decision-making capacity to make the choice. Defendant Sharif also accessed other physicians' patient lists in an unauthorized manner, which is a violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

**18. Patricia Copley, MD, MPH ("Dr. Copley")** is a resident of the State of Kentucky and is a board-certified physician who holds current board certifications in the following areas of medicine: internal medicine, pulmonary disease, critical care medicine, and sleep medicine.  She was also boarded in palliative care medicine and family medicine. Dr. Copley currently has active licenses in TN, TX, IN, VA, KY, and OH. Upon graduating from Tulane School of Public Health (New Orleans, Louisiana) with a Masters of Public Health, she graduated from East Tennessee State University Quillen College of Medicine (Knoxville, Tennessee) and completed an internal medicine residency (ETSU, Johnson City, TN) and a family medicine residency (Texas Tech, Amarillo, TX). Subsequently, she completed a combined fellowship in pulmonary and critical care at Wake Forest University Baptist Medical Center (Winston-Salem, North Carolina). During the course of her career, Dr. Copley has taught residents, nurse practitioners, and pulmonary-critical care fellows. Since May 2012, Dr. Copley has served as an independent physician contractor and practices in several states for different periods of time pursuant to a particular state's locums tenens, which allows a physician to temporarily fulfill the duties of another.

19. Although Dr. Copley has encountered variable quality of care among different hospitals and medical professionals, nothing has compared to what she witnessed with the Defendants' conduct when she was working at The Medical Center of Southeast Texas (Port Arthur, Texas).

8

Her responsibilities at The Medical Center of Southeast Texas included providing 24/7 coverage in the intensive care unit for critically ill patients. At various times, due to the hospital's policy, she worked as a consultant or as the admitting physician of record. The locums agency, ICON Medical Network, arranged the contract with HNI Healthcare – the same entity with whom Defendant Sharif contracted initially to work at The Medical Center of Southeast Texas. During Dr. Copley's tenure at the Defendant hospital, Defendant Sharif transitioned to an independent contractor status with both the hospital and HNI.

20. While Dr. Copley's initial interactions with Defendant Sharif were professionally cordial, once Dr. Copley attempted to address her observations about his substandard care, conduct which led to the direct submission of allegedly false and fraudulent claims by the Defendants Sharif and The Medical Center of Southeast Texas, and poor communication with staff, patients, families, and colleagues, Defendant Sharif's demeanor changed.

21. As indicated above, Dr. Copley, Dr. Sukhavasi, and Dr. Goli attempted to raise concerns associated with substandard care (including patient deaths) and conduct giving rise to the submission of false and fraudulent claims with the hospital's administration and Defendant Sharif. Instead of taking the conduct seriously, Defendant MCST, Defendant Steward, and Defendant Sharif provided responses which amounted to "turning a blind eye" because the financial impact would be too adverse if it were to be addressed. Drs. Goli and Sukhavasi received a letter from Defendant Sharif's attorney accusing both Drs. Goli and Sukhavasi of defamation, even though it is both a professional and legal obligation to raise these issues through the systems in place at the hospital as they did.

9

*Defendants*

22. **The Medical Center of Southeast Texas ("MCST")** is an acute care hospital

designated as a Level IV Trauma Center, which is located at 2555 Jimmy Johnson Blvd., Port

Arthur, Texas 77640.[2] Part of the Steward Health System, LLC, it is jointly owned with physicians.

This hospital was acquired from IASIS Healthcare on September 29, 2017, by Defendant Steward

and retained its CMS Certification Number (450518).[3]

23. MCST's total annual patient revenue is approximately $969,883,872.00, which

includes 28,307 total patient days. As **Table A** demonstrates, MCST's *Inpatient Utilization*

*Statistics by Medical Service* are as follows:[4]

**Table A**

|  | Number Medicare Inpatients | Average Length of Stay | Average Charges | Medicare Case Mix Index (CMI) |
|---|---|---|---|---|
| Cardiology | 237 | 3.30 | $44,335 | 1.1173 |
| Cardiovascular Surgery | 59 | 3.12 | $151,950 | 3.3199 |
| Medicine | 427 | 4.43 | $60,901 | 1.4856 |
| Neurology | 106 | 4.53 | $53,066 | 1.1539 |
| Oncology | 19 | 5.68 | $81,812 | 1.6387 |
| Orthopedic Surgery | 81 | 4.51 | $106,220 | 2.4935 |
| Orthopedics | 44 | 5.73 | $47,093 | 0.9509 |
| Psychiatry | 66 | 5.58 | $24,124 | 1.2006 |
| Pulmonology | 327 | 5.27 | $70,627 | 1.7434 |
| Surgery | 64 | 7.64 | $130,928 | 3.7406 |
| Urology | 128 | 3.73 | $41,822 | 1.1083 |
| Vascular Surgery | 19 | 4.79 | $115,942 | 2.2155 |
| **Total** | **1,587** | **4.57** | **$65,909** | **1.6295** |

---

[2] *See* https://www.medicalcentersetexas.org/services-directory/emergency-care?gclid=CjwKCAjw_ISWBhBkEiwAdqxb9iYsFedXbEjwwHOo5OuXqzHlGl82XSgD8cCRQ6YgO3puu7zuwzfEpBoCMGkQAvD_BwE&gclsrc=aw.ds (last visited Jul. 3, 2022).

[3] American Hospital Directory, *The Medical Center of Southeast Texas*, https://www.ahd.com/free_profile/450518/The_Medical_Center_of_Southeast_Texas/Port_Arthur/Texas/ (last visited Jul. 3, 2022).

[4] *Id.*

24. Notably, the two medical services with the highest Medicare utilization are "Medicine" and "Pulmonology" – Defendant Sharif's practice areas, which contribute significant revenues for Defendant Steward and Defendant MCST. MCST's annual *Financial Statistics*,[5] which include its Diagnosis Related Groups and Ambulatory Payment Classifications follow in **Table B**.

**Table B**

|  | $ | % |
|---|---|---|
| **Gross Patient Revenue** | **$969,883,872** | 98.9 |
| Non-Patient Revenue | $10,743,616 | 1.1 |
| **Total Revenue** | **$980,627,488** | - |
| Net Income (or Loss) | $1,273,688.00 | 0.1 |

25. In sum MCST net income, which is derived in part from its false and fraudulent claims submissions, results in net income, which exceeds $1 billion annually.

26. **Steward Health Care System LLC ("Steward")** is a for-profit Delaware limited liability company that owns or is otherwise affiliated with and controls and operates, among other entities, MCTS (Port Arthur, Texas), with its headquarters located at 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.[6] Steward also owns or is otherwise affiliated with and controls and operates multiple hospitals and health care provider entities, including the hospitals named as defendants herein.[7]

---

[5] *Id.*
[6] *See* https://www.steward.org (last visited Jul. 3, 2022).
[7] Steward was previously owned and controlled by Cerberus Capital Management, LP, a private equity firm, for a decade until it bought back its ownership interest in June 2020. *See* https://www.healthleadersmedia.com/finance/steward-health-care-buys-back-control-cerberus (Jun. 2, 2020).

11

27. According to its website, "[o]ver the past decade, we've perfected a business model that keeps patients healthy, keeps costs down, and succeeds in today's complicated marketplace."[8] In reality, Steward's joint-physician owned and controlled MCTS's achieved its lower costs by failing to administer adequate patient care, falsifying or causing to be falsified clinical data within patient files, allowing medical staff members such as Defendant Sharif to over prescribe and under manage critical care patients, and encouraging physicians such as Defendant Sharif to violate HIPAA by allowing him unbridled and unlimited access to patient records, despite not being on the patient's care team. In turn, the Defendants knowingly submitted or caused to be submitted false and fraudulent claims for patients who either never received the services indicated, did not meet the criteria, or have the information in the medical record to establish medical necessity, and/or up coded the patient encounter – all of which benefitted the defendants to the detriment of the taxpayers and the government program beneficiaries, including Medicare beneficiaries.

**28. Roozbeh Sharif, MD, M.ED., M.SC. ("Defendant Sharif")** is a resident of Texas and has national provider identifier ("NPI") 1396037008 and practices both critical care medicine (Taxonomy Code 207RC0200X) with a focus on pulmonary disease (Taxonomy Code 207RP1001X).[9] Often, Defendant Sharif's substandard care (as detailed herein) and actions had a pernicious effect on the care rendered MCST's patients, including but not limited to Medicare beneficiaries, as well as providers striving to provide quality patient care and submit accurate claims for payment to the United States Government. Defendant Sharif co-conspired with Defendant MCST's administration to knowingly (or at a minimum recklessly) perpetuate a culture of providing substandard patient care, not substantiating medical necessity in the medical record,

---

[8] *See* https://www.steward.org/model/business (last visited Jul. 3, 2022).
[9] *See* https://npidb.org/doctors/allopathic_osteopathic_physicians/critical-care-medicine_207rc0200x/1396037008.aspx (last visited Jul. 3, 2022).

12

billing for services that were never provider or upcoding for services, which caused the submission of false and fraudulent claims for reimbursement by federal government entities such as the Centers for Medicare and Medicaid Services ("CMS").

<b>IV. APPLICABLE GOVERNMENT PROGRAMS AND RELEVANT LAWS</b>

**A.  <u>Government Programs and Certification Requirements</u>**

***The Medicare Program***

29. The United States Government administers the Medicare Program through the U.S. Department of Health and Human Services ("HHS") and its subagency, CMS. Established in 1965 through Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, the Medicare Program is primarily for persons 65 and older, as well as disabled individuals. These individuals are referred to as "Medicare Beneficiaries."

30. There are four (4) "parts" of the Medicare Program, which are set forth below:

- Part A – referred to as traditional Medicare, covers inpatient hospital services and services for patients with end-stage renal disease (ESRD);

- Part B – also referred to as traditional Medicare, covers outpatient physician services, including prescription drugs administered "incident to" physician services;

- Part C – also known as "Medicare Advantage" includes all the benefits covered by traditional Medicare (Parts A and B); however, they are administered by private insurance companies and CMS pays a fixed monthly amount per beneficiary depending on an individual's risk adjustment score; and

- Part D – the prescription drug benefits portion, which became effective January 1, 2006, provides prescription drug benefits by means of private companies referred to as Part D sponsors.

*The Medicaid Program*

31. Medicaid, a joint federal-state program, was also created in 1965 as part of the Social Security Act; however, it provides healthcare benefits for select groups that meet a certain financial threshold and the disabled. In Texas, "Medicaid and the Children's Health Insurance Program (CHIP) provide health coverage for low-income children, families, seniors and people with disabilities."[10] The federal Medicaid statute requires each participating state to implement a plan containing certain specified minimum criteria for coverage and payment of claims. *See* 42 U.S.C. §§ 1396, 1396a(a)(13), (a)(30)(A).

*Medical Necessity*

32. In order to have goods and services covered by Medicare (or other government programs such as Medicaid and TRICARE), medical necessity must be substantiated in the medical record and is a fundamental requirement. Medicare does not cover any expenses incurred for services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury...." 42 U.S.C. § 1395y(a)(1)(A).

33. It is incumbent upon every healthcare provider seeking payment for claims submitted under the Medicare Program to assure that services it provides "(1) will be provided economically and only when, and to the extent, medically necessary; (2) will be of a quality which meets professionally recognized standards of health care; and (3) will be supported by evidence of medical necessity and quality in such form and fashion and at such time as may reasonably be required by reviewing quality improvement organization in the exercise of its duties and responsibilities." 42 U.S.C. § 1320c-5(a).

---

[10] *See* https://www.hhs.texas.gov/services/health/medicaid-chip (last visited Jul. 3, 2022).

34. To ascertain the reasonableness and necessity of those services and whether payment is appropriate, Medicare requires timely, proper, and complete documentation in a patient's medical record of the services rendered or goods provided to beneficiaries. Specifically, the law provides that, "[n]o payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period." 42 U.S.C. § 13951(e).

*Medicare Participation Attestation*

35. Eligibility to participate in the Medicare program and the ability to subsequently submit claims for goods and services rendered to Medicare Beneficiaries for reimbursement from CMS, requires providers, both physicians and hospitals, to submit either a CMS Form 855I (Physicians and Non-Physician Practitioners), CMS Form 855B (Clinics, Group Practices, and Select Suppliers), and/or CMS Form 855A (Institutional Providers) and make the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

36. Subsequently, a provider submits either a Form CMS-1500 (the electronic equivalent is the American National Standards Institute (ANSI) Accredited Standards Committee (ASC) X12N 837P (Professional) Version 5010A1) or if an institutional provider a Form CMS-1450 (ANSI ASC X12N 837I (Institutional) Version 5010A2) claim form to the United States Government for reimbursement for medically necessary services provided. There is a similar certification, which reads:

In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instruction, which are available from the Medicare contractor:… 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE.

37. Additionally, hospitals submit an annual cost report (Form CMS-2552-10) to CMS (via the Medicare Administrative Contract, which in Texas is Novitas Solutions)[11], which requires a hospital's administrator to certify that the services furnished to Medicare and Medicaid Beneficiaries identified in the report were provided in compliance with the laws and regulations governing the provision of health care services:

MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)

I HEREBY CERTIFY that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by _____ (Provider Name(s) and Number(s)) for the cost reporting period beginning _____ _____ and ending _____ and to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

38. Simply stated, accurate medical records upon which initial claims for legitimate and medically necessary services that are substantiated in the patient's chart were submitted to Medicare and Medicaid Beneficiaries are required for the initial claim to be paid by the United

---

[11] *See* https://www.novitas-solutions.com/webcenter/portal/MedicareJH (last visited Jul. 3, 2022).

States Government, as well as the attestation by the hospital on its annual Medicare cost report. Here, the Defendants attested that the statements are true, and that care was rendered in accordance with relevant laws and regulations, as well as the books and records being accurate, which they were not because of the underlying fraud.

***Health Resources and Services Administration (HRSA)***

39. HRSA is an agency, which falls under the umbrella of the U.S. Department of Health and Human Services (HHS). HRSA has approximately 2,244 employees and received $12.1 billion in funding for FY 2021.[12] Its goal is to "assure that people in the U.S. have access to a broad range of essential personal and public health services."[13]

40. During the COVID-19 pandemic, HHS established a program to be administered through HRSA to "claims reimbursement to health care providers generally at Medicare rates for testing uninsured individuals for COVID-19, treating uninsured individuals with a COVID-19 diagnosis, and administering COVID-19 vaccines to uninsured individuals. A separate program, the HRSA COVID-19 Coverage Assistance Fund, is available to reimburse providers for COVID-19 vaccine administration but with cost sharing."[14] In order to receive funding, providers must submit claim information and attest through the online portal. Notably, testing-related visit settings that are expressly mentioned include office, urgent care or emergency or telehealth.

***Other Federal Health Care Programs***

41. The federal government administers other health care programs including, but not limited to, TRICARE, CHAMPVA, and the Federal Employee Health Benefit Program. TRICARE, administered by the United States Department of Defense, is a health care program for

---

[12] *See* https://www.hrsa.gov/about/organization/index.html (last visited Jul. 4, 2022).
[13] *Id.*
[14] *See* https://www.hrsa.gov/CovidUninsuredClaim (last visited Jul. 4, 2022).

individuals and dependents affiliated with the armed forces. CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100 percent service-connected disability. The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal insurance for federal employees, retirees, and survivors.

**B.  Relevant Laws**

42. The United States False Claims Act ("FCA") prohibits, *inter alia*, the following: knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; knowingly making or using (or causing to be made or used) a false record or statement material to false or fraudulent claim; conspiring to commit a violation of the False Claims Act; and knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money to the Government. 31 U.S.C. §§ 3729(a)(1)(A), (B), (C) and (G).

43. The FCA also prohibits knowingly making or using a false or fraudulent record or statement to get a false or fraudulent claim paid of approved by the Government. In addition, the FCA prohibits conspiring with another person to defraud the Government getting a false or fraudulent claim allowed paid.

44. The FCA also prohibits knowingly making or using a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

45. While some FCA actions involve claims submitted to the Government that are false or fraudulent on their face, such as the submission of claims for services not rendered, the FCA's

18

reach is not limited to these claims. "[A]ccurate claims submitted for services actually rendered may still be considered fraudulent and give rise to FCA liability if the services were rendered in violation of other laws." *United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 662 (S.D. Tex. 2013) (Costa, J.), aff'd sub nom. *United States ex rel. Parikh v. Brown*, 762 F.3d 461 (5th Cir. 2014), opinion withdrawn and superseded on reh'g and aff'd sub nom. *United States ex rel. Parikh v. Brown*, 587 F. App'x 123 (5th Cir. 2014).

46. The Defendants' co-conspiracy and fraudulent scheme establishes the existence of factually false and legally false claims like those settled by the DOJ including *United States ex rel. Oughatiyan v. IPC The Hospitalist, Inc., et al.*, Case No. 09-cv-5418 (N.D. Ill.) (settling allegations for $60 million that the defendants fraudulently seeking payments to which they were not entitled by misrepresenting the services that were billed to Government Programs); *United States ex rel. Zappala, et al. v. Steward Health Care System LLC, et al.*, No. 18-cv-12125 (D. Mass.) (resolving allegations that Steward paid referring physicians for services that were not provided); and *United States ex rel. Lee v. Tarrant County Hospital District*, Case No. 4:19-cv-00412 (N.D. Tex.) (indicating that the Relator alerted hospital leadership about improper billing (upcoding) and double billing concerns, which ultimately led to the defendant paying over $3 million to resolve the allegations).

47. Therefore, substantiating that the conduct alleged herein is material to the Government Programs, which is funded by the Federal Government and for Medicaid, the State of Texas.

## V. THE DEFENDANTS' SCHEMES RESULTED IN THE TRANSMISSION OF FALSE AND FRAUDULENT CLAIMS AND CERTIFICATIONS THAT WAS MATERIAL TO GOVERNMENT PROGRAMS.

19

48. The Defendants knowingly and intentionally (or at a minimum recklessly) engaged in a scheme to increase revenues by submitting false and fraudulent claims for the following: (1) services not provided or double billed; (2) upcoding for services that did not meet medical necessity and/or not medically indicated; (3) providing substandard and/or worthless care; and (4) knowingly retaining the overpayments to the detriment of patients, U.S. tax payers, and Government Programs.

49. General facts reflecting the various Relators' first-hand knowledge are addressed before a specific section identifying specific patients and the related alleged illicit conduct is expressly provided herein.

### *Defendants Co-Conspiracy to Submit False and Fraudulent Claims for Payment from Government Programs.*

50. Between August 2020 and continuing through the present, the Co-Conspirator Defendants knowingly and intentionally (or at a minimum reckless) submitted false and fraudulent claims for the payment of medical goods and services rendered to patients in violation of the FCA.

### *Defendants Billing for Services Not Performed or Double Billed.*

51. All Relators observed Defendant Sharif's practice patterns and billing patterns. Dr. Sharif did not enter the daily progress notes on the day of service, and the recorded progress notes were copied, pasted, and billed at a higher pay level (i.e., up coded).[15] Relators observed the self-steering of patients by Dr. Sharif directly from the emergency room who needed intensive care as the first contact in-house physician. The alleged patient steering occurred despite the availability of critical care and tele-medicine ICU with an established pathway for care transition. Most

---

[15] It is possible that a split billing pattern was also occurring, whereby some claims were billed through his private company, while he was also getting paid through the locum tenens company, with whom Dr. Sharif was initially contracted.

notably, all patients coming into the hospital from Bon Vie Skilled Nursing Facility (Port Arthur, Texas)[16] were self-referred by Dr. Sharif. Bon Vie Skilled Nursing Facility ("SNF"), where Dr. Sharif serves as a medical director, rotated patients through the hospital to re-establish the coverage period and allow the individuals to go back into the SNF with Medicare and/or Medicaid paying the bill.

52. When Defendant Sharif was the scheduled intensivist, he would be consulted and manage ICU patients. When his days were complete, he would change his role to a pulmonary consultant so that he could continue to see the patients with the oncoming intensivist and when the patient was transferred to the floor. Normally, a community pulmonologist does not follow along with a pulmonary-critical care physician in the intensive care unit. Medical and billing services overlap. When the patient is stable for the floor, if pulmonary needs to continue to be involved with the case, a pulmonologist is contacted on the day of transfer to assume management. Dr. Copley attempted to negotiate with Dr. Sharif to see these patients in a courtesy capacity in the intensive care unit (no orders or management) so that he could follow along with the care. This was not acceptable to him as he wished to see, document and bill for the time seeing the patient. Additionally, Defendant Sharif would not chart either critical care management or pulmonary management on a timely basis. As a result, he would back date and adjust his documentation to fit events afterwards and it would cause confusion. Patient care plans were also incomplete and confusing. Dr. Sharif would also document that he spoke to specific families when those family were clear that they had not spoken with him. He would document physical exam and critical care time that was not provided. Nurses regularly reported that he had not stepped into a patient's room despite him documenting that he had. Dr. Copley's concerns regarding the charting and behavior

---

[16] *See* https://www.cantexcc.com/snf/bonne-vie/ (last visited Jul. 3, 2022).

21

were discussed directly with Dr. Sharif as well as hospital administration.  Dr. Copley was clear to both parties that billing fraud was allegedly being committed.

***Defendants Upcoding of Services.***

53. The Defendants knew about the upcoding of services, which were submitted to Government Programs for payment. Instead of instituting changes, the three Defendants co-conspired to continue to the fraud in order to reap the financial benefits, even if it meant care that was detrimental to Government Program beneficiaries and led to excessive payments, which harm the Federal Fisc.

54. The specific conduct by Defendant Sharif that Dr. Copley observed over the ten (10) month period when she contracted to work for Defendant MCST includes the following:

- Providing substandard patient care, which did not meet the American College of Chest Physicians ("ACCP") and the Society of Critical Care Medicine ("SCCM") guidelines;

- Performing medically unnecessary procedures, poor or absent follow-up, unavailable to address patient complications, and substandard management of patient care, providing non-critical care services to the patient that were medically unnecessary. For example, he would frequently perform procedures as a pulmonary consultant on a critical care case to capture the procedural billing. Often the procedures were either unneeded, not requested, or not desired by the intensivist/attending of record.  An intensivist is a board-certified physician who provides specialized care for critically ill patients.  These are physicians contracted to cover the patients in the intensive care unit and who are competent to manage the care without Defendant Sharif's additional treatments;

- Documenting in a manner detrimental to patient care and patient care team communication. This included non-existent charting, charting for multiple days at one time, copying

22

charting from one patient and pasting it onto subsequent service days with minimal or no changes, charting inconsistency that suggests the patient was not seen for the day billed (for example, no change in physical exam when there was a clear change in patient condition from one day to the next. This suspicion was supported by nurses who relayed to Dr. Copley that he would make a chart entry without even having entered the patient's room);

- Violating HIPAA through the unauthorized access of patient charts without being a member of the hospital care team or without a consult from the patient's attending physician; and

- Coding and submitting false and fraudulent claims for critical care management when one of the Relators were actually providing the critical care services. Per CMS guidelines, the CPT code 99291 (evaluation and management of the critically ill or critically injured patient, first 30-74 minutes) is used to report the first 30-74 minutes of critical care on a given calendar date of service. This code can only be used once per calendar date to bill for care provided for a particular patient by the same physician or physician group of the same specialty. Dr. Sharif provides the same specialty care as the intensivists providing care in the intensive care unit. The intensivists were scheduled to work worked a 12-hour shift and were physically present to handle all patient issues. There would have been no critical care needs that Dr. Sharif needed to provide. Per subsequent discussions with the hospital administration towards the end of Dr. Copley's contract, it was understood that Dr. Sharif would be allowed to see patients in the ICU as a pulmonologist if consulted but not provide critical care services/management.

55. Defendant Sharif knew what his obligations were with respect to accurate chart documentation and the submission of claims for services to patients to CMS. On June 1, 2021 (3:36 PM), Defendant Sharif, using his Steward email account (Roozbeh.Sharif@steward.org) sent Dr. Copley (patriciacopley@inspiratorysolutions.com) an email (Subject: CMS – Critical Care Billing). In this email, Dr. Sharif states:

> Patricia –
>
> Following our conversation this morning, I did some research to make sure I am under the right impression about critical care billing. CMS document [attached] is through [sic] but worth reading. Below is also from one of CCM forums I am following. My only concern was when you raised concerns about [the] possibility of *fraud*. If you have any other reference stating otherwise please educate me about it.
>
> That being said, I take your friendly suggestion to my heart.
>
> Thanks,
>
> Roozbeh
>
> **Critical Care Coding and Documentation Tips**
> 1. The patient must have a critical diagnosis or symptom.
> 2. There must be a critical diagnosis or symptom(s), regardless of the area in which the physician provides services.
> 3. Care provided must require complex medical decision-making by the physician.
> 4. The physician must clearly document in the medical record the time spent providing critical care.
> 5. Document in detail all procedures performed during the patient encounter that are part of critical care.
> 6. Document all procedures and services in detail that are not part of the critical care.
> 7. Document and code all diagnoses and comorbidities that affect patient care.
> 8. Document the acuity/severity of all diagnoses (e.g., acute, chronic, acute-on-chronic, exacerbation).
> 9. List all conditions related to the underlying cause, if known (e.g., sepsis due to pneumonia).
> 10. Clarify in the documentation any conditions that are present on admission.
> 11. Document any suspected or rule-out conditions along with signs and symptoms. Confirm any uncertain diagnoses at the time of discharge.
>
> Roozbeh Sharif, MD, Med, MSc

56. Despite his response and newfound knowledge, Defendant Sharif continued with this conduct (i.e., substandard care, medical necessity issues with documentation, documenting in the patient's chart that services were provided when they were not), which in turn led to the knowing and intentional (or at a minimum reckless) submission of false and fraudulent claims for patient

24

services to CMS and other government programs – a practice known, condoned, and encouraged by the other co-conspirators – Defendant Steward and Defendant MCST, who reaped the financial benefits of the conduct.

***Defendant Sharif's Conspiracy with Defendant MCST and Defendant Steward to Provide Substandard and/or Worthless Care to Government Program Beneficiaries.***

57. The following email exchanges substantiate that the Relators were correct about Defendant Sharif's illicit access of patient charts for his own financial gain, as well as investigating substandard care issues regarding a particular patient. Other billing and fraud, waste, and abuse issues were not addressed by either Defendant Steward or Defendant MCST. Josh Snow, CEO of MCST from March 8, 2021,[17] onward, as well as Dr. Gary Minnie, Chief Medical Officer ("CMO")[18] were also aware of both Defendant Sharif's conduct, as well as the co-conspirator conduct of Defendant MCST and Defendant Steward because Dr. Goli, Dr. Sukhavasi, and Dr. Copley all raised concerns on various occasions. As indicated in their joint January 21, 2022, letter to Mr. Snow (Subject: CMO: placing patients in danger), Relators Goli and Sukhavasi state the following:

> Dear Josh,
>
> We are writing this letter as follow-up to the previous complaints we brought to your attention in September 2021 on the conduct of your Chief Medical Officer, Dr. Gary Minnie, and Dr. Sharif's continued procedure-associated deaths.
>
> We continue to observe "the salvage by death" attitude by your Chief Medical Officer, Dr. Gary Minnie, and his preferential treatment towards Dr. Sharif-the hospital's new pulmonary and critical care recruit in 2021.
>
> ***We want to bring to your attention a recent death caused by Dr. Sharif to a patient a few hours after chest tube placement. This patient had undergone cardiac surgery a few weeks prior. A timely CT surgery consult could have saved [the] untimely death.*** **(emphasis added).**

---

[17] *See* https://www.beaumontbusinessjournal.com/news/medical-center-setx-names-new-president (Mar. 8, 2021).

[18] *See* https://www.medicalcentersetexas.org/newsroom/2019-10-03/medical-center-southeast-texas-announces-expansion (Oct. 3, 2019).

25

In our opinion, your Chief Medical Officer, Dr. Gary Minnie, is placing our patients, this hospital, and other autonomous providers in danger. Dr. Gary Minnie's lack of familiarity with federal anti-kickback issues by assigning Dr. Sharif (new provider) to pulmonary directorship, peer review committee, providing office space, and facilitating joint ventures with the hospital that appear to remunerate Dr. Sharif for referral[s] to the hospital.

We strongly feel that Our patient's Unheard [sic] and weak Voices [sic] and family members' ignorance & trust are taken advantage of by your Chief Medical Officer, Dr. Gary Minnie:
- By exposing critically ill patients to Dr. Sharif, a high-risk operator causing premature death, extending hospital stay and federal revenue wastage
- By facilitating and concealing Dr. Sharif violation acts by preferential treatment
- By violating the federal anti-kickback statute by enabling free service, unfair competition, and patient steering to Dr. Sharif[.]

We demand an impartial inquiry and response to our concerns.

Many thanks for your attention[.]

Sincerely,
<Signatures of Dr. Goli and Dr. Sukhavasi>

**March 19, 2022 (1:32 PM) email from Gary Mennie, CMO to Dr. S Goli (heartandlung2014@gmail.com) with Josh Snow, CEO (Josh.Snow@steward.org) cc'd.** Follow-up regarding Dr. Hall, Peer Review Committee Chairman's follow-up regarding the confidential actions taken by the committee. "I also want to update you on the chart (patient XX), you asked to be reviewed. I was informed it has been sent for outside review, because multiple specialist [sic] will be reviewing the chart this may take a couple months."

**January 25, 2022 (11:35 AM) email from G. Mennie, CMO to Dr. Goli with J. Snow cc'd.** "Dr. Sujatha Goli, Dr Sukhavasi, gave us a copy of the round list build cover list this morning. I had corporate Meditech IT show us how to reset and rebuild the list. Dr Sharif has been removed from this list this morning. Your list should only include yourself and Dr. Sukhavasi. Please let me know if Dr. Sharif shows up on any other list that you have, so I can have him removed and the list rebuilt to include only yourself and Dr. Sukhavasi[.] <Picture of the screenshot from Meditech IT included> Thanks Gary"

**January 25, 2022 (10:55 AM) email from G. Mennie, CMO to Dr. Goli with J. Snow cc'd.** "Dr. Sujatha Goli,
Wanted to give you an update on the complaint regarding Dr. Sharif, you brought to the Medical Staff regarding Mr Leblanc [sic]

Steps involved as we investigate the complaint. First this can take several weeks to go through the review process. Once the review is completed we will give you a[n] update on the findings. Our Quality/Risk Director started reviewing the chart 1/24/22 [sic]
We will ask corporate Information Technology to review and check if Dr. Sharif is accessing your patient list or the medical record. Our Quality/Risk Department will interview staff that was involved in care of the patient. Once the review is complete, it will then be brought to the peer review committee.

Your request for review of Patient XX medical record by peer review.

Quality/Risk department is getting the chart copied and it is being sent to an outside independent review company, It [sic] will be reviewed by board certified physicians.

This process can take several weeks to months. Once the chart is reviewed, the reviewer will write up a report with their findings. That review and report will then be brought to the peer review committee. If I can assist you in any other way please let me know.

26

Sincerely,

Gary R. Mennie, M.D., FAAFP, FTAOG
Chief Medical Officer"

58. To date, neither Dr. Goli nor Dr. Sukhavasi has learned of the outcome of the peer review of Patient XX. As a result of MCST's "inquiry" into the alleged conduct, Defendants Steward and MCST sent a response to Dr. Goli and Dr. Sukhavasi indicating that the conduct that they raised with Mr. Snow and Dr. Minnie was permissible.

**From:** "Snow, Josh T." <Josh.Snow@steward.org>
**Date:** March 11, 2022 at 5:00:47 PM CST
**To:** "Goli, Sujatha" <Sujatha.Goli@steward.org>, sambasiva sukhavasi <sukhavasimdpa@gmail.com>, sujatha and Anil Goli <heartandlung2014@gmail.com>
**Subject: Follow-Up to Letter Dated January 21, 2022**

Drs Goli and Sukhavasi,

Please see the letter attached […], which I received today.  If you have any questions, please let me know.  I look forward to meeting with you on Monday.

**Josh Snow**
President
The Medical Center of Southeast Texas
2555 Jimmy Johnson Blvd.
Port Arthur, TX. 77640
P: 409.853.5746  F: 409.853.5910  E: josh.snow@steward.org
**Steward Health Care | steward.org**

59. Dr. Copley also raised the patient care and billing issues directly with Defendant Sharif, as well as separately with MCST's administration. Dr. Copley also observed substandard or worthless patient care administered by Defendant Sharif at Defendant MCST, with the knowledge and consent of Defendant Steward. For example, a Covid positive patient who was diagnosed by Dr. Sharif as having a right upper extremity deep venous thrombosis (clot in the vascular system). He proceeded to place a right sided jugular central vein catheter but did not order removal of the PICC which was in the right upper extremity.  When she assumed the patient care, the patient had

developed compartment syndrome of the right arm and required emergent surgical intervention to save the limb. The central line should have been placed on the left. The PICC line contributing to the clot and poor arm circulation should have been pulled as soon as placement confirmed by Dr. Sharif on the chest x-ray.

60. After attempts to communicate with Dr. Sharif failed, she resorted to regular communication with the nursing team, case management, and nursing supervisors and ultimately the Risk Management Team for documentation and follow-up when a significant adverse patient event occurred in relation to Defendant Sharif's care. Dr. Copley began to witness patient care that was not medically necessary and so substandard that she escalated her concerns directly to Dr. Gary Mennie, Chief Medical Officer, Ms. Dana Steffer, Chief Nursing Officer, as well as the various Chief Executive Officers and Ms. Steffer's replacement, all of whom she met multiple times with them either individually or as a group. Dr. Copley raised the patient care concerns and false and fraudulent billing regularly, as well as the other aforementioned issues, frequently so as to effectuate change through the various committees in place at the hospital.

61. Just before Ms. Steffer left, Dr. Copley met with her and learned that a cardiothoracic surgeon was removed from the medical staff for substandard care and poor patient outcomes. Ms. Steffer asked Dr. Copley if Defendant Sharif provided a similar danger and Dr. Copley unequivocally stated that she "thought it was worse". There was clear communication by Dr. Copley to Defendant MCST's administration and physician leadership that Defendant Sharif's substandard care resulted in patient harm and contributed to patients' deaths, while the charting/billing for services that were either not performed or not medically necessary constituted fraud by way of submitting claims for payment to both government programs and private insurers.

28

62. Dr. Copley's last meeting with various c-level executives and the CMO was the week of September 20, 2021, which was after Dr. Copley provided her 30-day notice to both the hospital and HNI. The specific issues raised in the last meeting included Defendant Sharif's behavior related to his "co-management" of patients, even when he was not asked to consult and would not stop when Dr. Copley and other physicians requested that he stop. Dr. Copley considered the medical-legal risk too great and it was clear that the hospital was more concerned about the revenue that Defendant Sharif was generating and not the illicit conduct.

63. After Defendants Steward and MCST's correspondence was received by Dr. Goli and Dr. Sukhavasi, Defendant Sharif hired a non-healthcare lawyer to send Dr. Goli, Dr. Sukhavasi, and Dr. Copley a cease-and-desist email correspondence for allegedly defaming him, which was received on or about March 11, 2022. Dr. Copley had already completed her contracted work assignments in September 2021 and no longer practiced at the hospital nor in the region.

64. As the June 10, 2022, announcement from the United States Attorney's Office in Boston, Massachusetts illustrates, Defendant Steward knew that the conduct raised by the Relators was problematic and allegedly violated the False Claims Act because it was perpetuating similar fraud in other parts of the health system and chose to turn a blind eye to Defendant Sharif and other physicians' alleged submission of false and fraudulent claims.[19]

---

[19] U.S. Department of Justice, *Steward Health Care System Agrees to Pay $4.7 Million to Resolve Allegations of False Claims Act Violations* (Jun. 10, 2022), https://www.justice.gov/usao-ma/pr/steward-health-care-system-agrees-pay-47-million-resolve-allegations-false-claims-act.

*Specific Patient Examples of False and Fraudulent Billing Related to Services Not Performed, Double Billed, and Up coded, as well as the Provision of Substandard and/or Worthless Care.*

65. As illustrated in **Table C** the Relators possess first-hand knowledge of the allegedly illicit conduct, which led to the Defendants submission of false and fraudulent claims to Government Programs.

**Table C**

| Patient Name (ID Number) – Redacted | Type of Conduct Leading to False and Fraudulent Claim | Synopsis (some information is redacted) |
|---|---|---|
| A | 1. Service not provided but claimed; <br> 2. Documentation not meeting medical necessity; and <br> 3. Upcoding. | X/13 note was copied to X/22 without change documented critical care billing time and no critical care services were provided. One Relator was the assigned intensivist on the case. |
| B | Substandard care | Patient had a trialysis catheter, which is a short-term dialysis catheter, in place that was working. Due to the patient's condition, the staff need addition IV access other than the single side port. The trialysis catheter was working appropriately during dialysis. Dr. Sharif proceeded to place a second dialysis catheter without discussing with family, against nurses' objections, without obtaining proper prior consent, and still did not provide the needed IV access for medications. Patient has cardiopulmonary arrest. One Relator (who was not on the patient care team) arrived for the code. Dr. Sharif arrived after CPR in progress and assumed code blue management. At which point a Relator's services were complete as a physician of record was present and she left. He proceeds to call family after which he instructs no further CPR. Dr. Sharif, however, walked away and refused to pronounce the patient dead or provide any further hospital management. |
| C | False and fraudulent documentation in patient chart, which led to upcoding. | Patient had a functional double lumen right PICC line, functional left midline and he still placed a IJ |

| | | |
|---|---|---|
| | | central line. Line sepsis was not the diagnosis and neither of the proceeding two lines were pulled. |
| **D** | 1. Unnecessary medical care; and<br>**2.** Substandard care – not indicated under the facts and circumstances. | Central venous line ("CVL") placed as pulmonary consultant without discussion with the intensivist. Patient had 3 working peripheral lines, no pressors and CVL was not needed. Continued with diuretics despite worsening hypernatremia, BUN and Creatine. Dr. Sharif routinely was extremely aggressive with diuresis without clinical evidence of volume overload, heart failure, cor pulmonale, and even on young patients. More than one of his aggressive diuretic managements resulted in an iatrogenic acute renal failure and even dialysis. |
| **E** | 1. Unauthorized access to patient records, even though he was not on the care team; and<br>2. Upcoding. | Dr. Sharif had repeated HIPAA violations for going into patient charts to determine pulmonary needs and then offering pulmonary services directly to patient without attending knowledge, request, or consent for a pulmonary consult. If Dr. Sharif was the intensivist on a patient's case, he would routinely place a pulmonary consult to himself so that he could continue to follow the patient on the floor. |
| **F** | Substandard care – specifically withholding medications and care in order to reduce costs and increase revenues. | One Relator was called to place a central line in a frail elderly dying patient because the physicians on record would not provide any comfort/hospice medications orally or intramuscularly. |
| **G** | 1. Documentation did not meet medical necessity; and<br>2. Upcoding. | Various dates - notes were identical with 1 line change from X/18. X/17 & X/18 notes were the same. |
| **I** | 1. Documentation did not meet medical necessity;<br>2. Upcoding; and<br>3. Service not provided but claimed. | Critical care documented with copied note and no critical care management. |
| **J** | Substandard care – specifically withholding care in order to reduce costs and increase revenues. | Covid positive patient who was full code. She was being managed on the floor. Patient received diuretics to the point of iatrogenic renal failure. She was on Lasix 80mg IV BID in addition to a Bumex drip. She was continued on oral potassium scheduled daily despite acute renal failure and worsening |

31

| | | |
|---|---|---|
| | | potassium. There was inadequate monitoring of renal failure with chemistry labs and a foley was not placed to monitor urine output. Oral magnesium was continued in the setting of acute renal failure and a magnesium > 3. Central line was placed on the floor at some point without any documentation when she arrived in the ICU. Patient had an enterococcus UTI but was not placed on appropriate antibiotics. She was not transferred to the ICU secondary to hospital politics and Dr. Sharif's desire to maintain critical care control. There was repeated documentation of the patient being in respiratory distress. There was a near cardiopulmonary arrest on 9/24 and still the patient was not transferred to the ICU despite being a full code, but managed on the floor. When the patient was transferred to the ICU she was in respiratory extremis and had cardiopulmonary arrest immediately following arrival. |
| K | Substandard care resulting in patient death. | Patient died after Defendant Sharif's chest tube placement. |
| L | Self-referral resulting in a potential AKS or Stark Law violation. | Self-referral from Bon Vie SNF. |
| M | 1. Double billing<br>2. Lack of medical necessity to substantiate a bronchoscopy on 9/X/2022 [sic should be 9/X/2021]<br>3. Late documentation in hospital medical record by Defendant Sharif (7 days after service) | 1. Double dipping working a critical care shift from 7-7 and billing separately for critical care.<br>2. X/S/2021 bronchoscopy did not meet the criteria for medical necessity and should have been performed (also notes all written within 2 weeks after the service). |
| N | Substandard care<br>Fraudulent billing | Self-pay but HRSA coverage. Sitting in ER to get a consult even though a critical care physician was on call and available.<br><br>8/X/21 note – billed and was started on 12/X/21.<br>9/X/2021 – notes for the procedure were completed on X/X/22. Double-billed HNI on various dates. No notes in chart from 9/8 and 9/9. |
| O | Substandard care<br>Fraudulent billing (potential) | Self-pay (HRSA)<br>Patient died. |

| | Late chart documentation on multiple occasions. | Care provided by Dr. Sharif on X/X/21 and chart notes entered on X/XX/21. |
|---|---|---|
| **P** | Substandard care<br>Fraudulent billing (potential)<br>Late chart documentation on multiple occasions.<br>Self-referral from ER. | Medicare Advantage Plan – Humana Gold.<br>Patient died.<br><br>Multiple dates where Defendant Sharif alleged saw patient for extended periods of time.<br><br>Medical record log shows the dates that the chart entries were made. |
| **Q** | 1. Fraudulent billing.<br>2. Access to patient records in violation of HIPAA. | Self-pay (HRSA)<br><br>X/XX//21 – patient came in through the ER and Dr. Sharif took over his care even though the ICU Intensivist was available. |
| **R** | 1. Substandard care.<br>2. Fraudulent billing. | Patient died.<br>Correlate X Dates, billing by Dr. Sharif. |

### *Defendants Knowing Retention of Overpayments.*

66. By engaging in the aforementioned conduct, the Defendants not only submitted false and fraudulent claims to Government Programs, they also knowingly retained the illicit payments and engaged in reverse false claims in violation of the False Claims Act and 60 Day Rule. To Relators' knowledge, none of the Defendants have made any repayments to the United States Government or other public or private payer.

### VI.  CONCLUSION

67. In keeping with *United States ex rel. Lemon, et al. v. Nurses to Go, Inc., et al.*, Case No. 18-20326 (5th Cir. May 7, 2019), the Relator has highlighted Defendants' false, fraudulent, and deficient certifications and attestations, for which premium payments were reaped by Defendants from the government and private payers. The conduct illustrates Defendants alleged false statements and fraudulent conduct, which was made (at a minimum) with reckless disregard for

the truth or falsity of the information, is material to the government's payment for medical services rendered to Medicare, Medicaid, HRSA, and TRICARE program beneficiaries in violation of the False Claims Act.

68. Submitting a claim for medical services not rendered for payment from the United States Government is the *sine qua non* of a factual false claim under the False Claims Act. Express legally false claims, which are premised on not having medical necessity substantiated in the medical record, providing substandard care, and upcoding, are also material to the government's willingness to pay claims. The knowing retention of overpayments is expressly prohibited in the False Claims Act. This assertion is based, in part, on the U.S. Government finding that similar conduct in previous False Claims Act cases and criminal prosecutions was material and caused the government to be harmed because of its payment of the false and fraudulent claims.

## VII.    CAUSES OF ACTION

### COUNT I
**False Claims Act – 31 U.S.C. § 3729(a)(1)(A)**
*(Violations of the FCA: Presenting False Claims for Payment Against Defendant)*

69. The Relators repeat and reallege the facts and allegations above as if fully set forth herein.

70. This a claim for treble damages and forfeitures under 31 U.S.C. §§ 3729-32, as amended.

71. Through the acts described above, Defendants sand their agents and employees knowingly presented and caused to be presented to the Government materially false or fraudulent claims for services not provided or double billed, upcoding for services that did not meet medical necessity and/or not medically indicated and providing substandard and/or worthless care.

34

72. The Government, unaware of the material falsity of the claims made or caused to be made by the Defendants, approved, paid, and participated in payments made by the Government Programs for false and fraudulent claims that otherwise would not have been allowed.

By reason of these payments and approvals, the Government has been damaged and continues to be damaged, in an amount yet to be determined.

**COUNT II**
**False Claims Act – 31 U.S.C. § 3729(a)(1)(B)**
***(Violations of the FCA: Use of False Statements Against Defendant)***

73. The Relators repeat and reallege the facts and allegations above as if fully set forth herein.

74. This a claim for treble damages and forfeitures under 31 U.S.C. §§ 3729-32, as amended.

75. Defendants, knowingly or acting with deliberate ignorance or reckless disregard for the truth, presented, either directly or indirectly, false, or fraudulent claims for payment to Government programs in connection with the false certifications and attestations made on the respective certifications and claims submission attestations, as well as their unauthorized use of Government funds for Defendants' services not provided or double billed, upcoding for services that did not meet medical necessity and/or not medically indicated and providing substandard and/or worthless care.

76. Defendants knowingly made, used, or caused to be made or used false records and statements to get false or fraudulent claims approved for payment by the Government, in violation of 31 U.S.C. § 3729(a)(1)(B).

77. The Government, unaware of the falsity for the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

**COUNT III**
**False Claims Act – 31 U.S.C. § 3729(a)(1)(C)**
*(Violations of the FCA: Defendants Co-Conspiracy)*

78. The Relators repeat and reallege the facts and allegations above as if fully set forth herein.

79. This a claim for treble damages and forfeitures under 31 U.S.C. §§ 3729-32, as amended.

80. Through the acts and inaction alleged above, Defendants, acting together in concert as each other's contractors, agents, partners, alter egos and/or representatives in making, using or causing to be made or used, false records or statements material to a false or fraudulent claim, or in presenting or causing to be presented, false or fraudulent claims to the United States for payment or approval, were acting within the course, scope and authority of such contract, agency, partnership and/or representation for the conduct described herein and conspired to engage in actions and inactions in violation of the FCA.

81. Defendants knowingly conspired and made, used, or caused to be made or used false records and statements to get false or fraudulent claims approved for payment by the Government, in violation of 31 U.S.C. § 3729(a)(1)(C).

82. The Government, unaware of the falsity for the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

83. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

**COUNT IV**
**False Claims Act – 31 U.S.C. § 3729(a)(1)(G)**
***(Violations of the FCA: Failure to Repay Government Funds Against Defendant)***

84. The Relators repeat and reallege the facts and allegations above as if fully set forth herein.

85. This a claim for treble damages and forfeitures under 31 U.S.C. §§ 3729-32, as amended.

86. Defendants knowingly made, used, or caused to be made or used false records and statements material to an obligation to pay or transmit money to the Government or knowingly made, used, or caused to be made or used false records and statements material to improperly avoid or decrease an obligation to pay or transmit money to the Government in violation of 31 U.S.C. § 3279(a)(1)(G).

87. Defendants knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

88. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

**PRAYER FOR RELIEF**

WHEREFORE, Relators pray, on behalf of the United States of America, that judgment be entered in favor of the United States and against Defendants, as follows:

A.     That Defendants be ordered to cease and desist from violating 31 U.S.C. § 3729 *et*

*seq.*;

B.      That this Court enter judgment against Defendants in an amount equal to treble (three times) the damages the Government has sustained because of Defendants' actions, plus a civil penalty of not less than $10,781.00 and not more than $23,607.00 for each violation of 31 U.S.C. § 3729 after November 2, 2015, pursuant to 81 Fed. Reg. 42491, 42494 (Jun. 30, 2016), 87 Fed. Reg. 2187 (Jan. 13, 2022);

C.      That the Relators be awarded the maximum amount allowed pursuant to § 3730(d) of the FCA;

D.      That the Relators and their attorney and the Government be awarded all costs of this action, including attorneys' fees and expenses; and

E.      That the Relators be awarded such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Relator, on behalf of the United States, demands a trial by jury on all issues so triable.

Respectfully submitted this 11th day of July 2022,

*/s/ Rachel Veronica Rose*    Rachel Veronica Rose
By: Rachel Veronica Rose
Rachel V. Rose – Attorney at Law, PLLC
Texas Bar No. 24074982
EDTX - Admitted
P.O. Box 22718
Houston, Texas 77227
Email: rvrose@rvrose.com
Telephone: (713) 907-7442
*Attorney for Relators*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(d), as well as the False Claims Act, the United States Attorney General and the United States Attorney for the Eastern District of Texas were provided with a copy of this Complaint, the Motion to Seal, the Proposed Order via Certified Mail, after a file-stamped copy was received by Rachel V. Rose, Esq.

/s/ Rachel Veronica Rose, Esq.